## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

JULIA CAVE, LARRY GREER JR.,     )
and LARRY ANTHANY GREER,     )
                 )
      **Plaintiffs,**     )
   v.                       )       **Case No. 21-cv-3215**
                 )
CITY OF SPRINGFIELD, ILLINOIS,     )
et al.,                         )
                 )
      **Defendants.**     )

## OPINION

**COLLEEN R. LAWLESS, U.S. District Judge:**

Before the Court is Defendants'[1] Motion for Summary Judgment (Doc. 35).

## I.     PROCEDURAL BACKGROUND

On October 4, 2021, Plaintiffs Julia Cave, Larry Greer, Jr. ("Greer Jr."), and Larry Anthany Greer ("Larry Anthany") filed a two-count Complaint. (Doc. 1). In Count I, Plaintiffs allege the individual Defendant-Officers deprived each Plaintiff of their rights secured by the Fourth Amendment pursuant to 42 U.S.C. § 1983. (*Id.* at 7-9). In Count II, Plaintiffs seek indemnification by the City of Springfield for the payment of any money judgment against the Defendant-Officers based on Illinois law. (*Id.* at 9).

---

[1] Defendants in this matter are City of Springfield, Officer Clifford Buscher III, Officer Colin Valenti, Officer Demarreo Johnson, Officer Nicholas Capranica, and Springfield Police Officers John Doe Nos. 1 and 2.

## II.     UNDISPUTED FACTS[2]

Cave and Greer Jr. are married with three kids, including Larry Anthany and Madisyn. (Doc. 1 at 2). They live on the north side of Springfield, Illinois and are the only African American family on their block. (Doc. 37 at ¶¶1, 3). On October 7, 2019, at about 10:30 p.m., Ian Brown called Madisyn to let her know that he was picking her up. (*Id.* at ¶1). Greer Jr. told Brown that he was not welcome at their home because Brown had previously threatened Larry Anthany with a knife. (Doc. 37 at ¶6). Brown and two of his friends still went to the residence and began shadowboxing in the front yard. (Dep. of Greer Jr., Ex. I at 14).

The Springfield Police Department dispatched officers to the Greer residence after Brown called to report that "his girlfriend's family would not let her come outside." (Doc. 37 at ¶1). According to Madisyn, her father got angry at Brown for calling the police and told him, "I'm really going to beat you up now." (Johnson BWC, Ex. C at 11:13-27). When Officer Capranica arrived, Greer Jr. and Brown were in the front yard yelling at each other while in fighting stances. (Capranica BWC, Ex. A at 0:40-0:45). Officer Capranica told them to stop fighting and grabbed Greer Jr. to pull him away from Brown. (Doc. 35 at ¶¶6-7). When Officer Capranica released Greer Jr., he went right back towards Brown and began to fight again. (Ex. A at 0:50-1:14). Officer Capranica warned both Greer Jr. and Brown that if they did not stop fighting, they would both be tased. (Doc. 35 at ¶9).

---

[2] Unless otherwise noted, the factual background of this case is drawn from the undisputed facts as conceded in Defendants' statement of undisputed material facts, Plaintiffs' response to Defendants' statement of undisputed material facts, and Defendants' reply to Plaintiffs' additional material facts. Exhibit citations are used for facts that the Court finds are undisputed from the summary judgment record.

Throughout the interaction, Cave did not see Brown or Greer Jr. actually hit each other. (Valenti BWC, Ex. D at 18:42). Officer Capranica handcuffed Brown because he was fighting, and Brown began explaining he was the one who called the officers for assistance. (Ex. A at 1:15-40). Cave approached Brown and began gesturing and yelling at him. (*Id.* at 1:40-51).

Larry Anthany arrived at the house at the same time as the officers and ran across the front lawn into the house. (Ex. C at 13:07-13:15). Officer Capranica did not see Larry Anthany with a bat, nor was it visible on any of the body-worn camera ("BWC") footage. (Ex. A at 14:28; Doc. 35 at ¶18). When Officers Johnson and Valenti went into the house, Larry Anthany was holding a bat near the door. (Doc. 35 at ¶20). Johnson handcuffed Larry Anthany on the couch while Officer Valenti held a taser to his back. (Ex. C at 0:50-1:33; Ex. D at 0:50-1:15). While Officer Johnson was handcuffing Larry Anthany, Cave was also in the house yelling for the officers to get off her son. (Doc. 35 at ¶23). Officer Valenti commanded her to step back and when she did not do so, Officer Valenti "pushed her out the door." (Ex. D at 30:35-45; Doc. 37 at ¶32). After being placed in handcuffs, Larry Anthany began to yell, and Officer Johnson tried to calm him down. (Ex. C at 1:50-5:32).

Officer Buscher restrained and handcuffed Greer Jr. while letting him know that he was not under arrest and "this is until we get everything calmed down." (Doc. 35 at ¶11). At this point, Officer VonBehren arrived, approached the group, and escorted Greer Jr. to his squad car. (VonBehren BWC, Ex. E at 0:27-35). Greer Jr. repeatedly told Officer VonBehren that he is worried about his son's safety. (*Id.* at 0:35-2:13). Officer VonBehren

placed Greer Jr. into the back of his squad car and walked back to the Greer residence. (*Id.* at 2:16-4:45). Officer VonBehren asked several officers whether Greer Jr.'s son was in the house and asked other officers if they had checked the house to see if anyone inside was injured or dead. (*Id.* at 5:30-6:16). After learning that Larry Anthony was safe, Officer VonBehren informed Greer Jr. that his son was unharmed. (*Id.* at 6:56).

After Greer Jr. was escorted to the car by Officer VonBehren, Cave yelled at Madisyn to get into the house and pushed Madisyn towards that direction. (Doc. 35 at ¶33). Officer Valenti told Cave that she needed to calm down and, when she did not, handcuffed her and told her that she is being detained. (*Id.* at ¶36; Ex. D at 2:01-59). Cave became distressed and told Officer Valenti that the handcuffs were hurting her and that she has lupus. (Ex. D at 2:01-59). Before putting her into the car, Officer Valenti adjusted Cave's handcuffs, and she yelled, "I said take them off, not tighten them up." (*Id.* at 4:19-24). Officer Valenti told her that he is going to leave her alone in the car to calm down. (*Id.* at 7:58-8:01). At about the same time, Officer Johnson took Larry Anthany outside of the house after Larry Anthany's repeated requests to do so. (Ex. C at 5:30-6:44). While outside, Officer Johnson placed him in the back of the squad car. (Doc. 35 at ¶26).

Once Cave calmed down in the squad car, Officer Valenti removed her handcuffs and released her. (Doc. 35 at ¶50). After she was released, Officer Johnson asked Cave to escort Larry Anthany back to the house. (Ex. C at 25:40). Because Larry Anthany still appeared agitated, Officer Johnson did not remove his handcuffs until inside the home. (*Id.* at 26:20-46).

Brown reported to officers that someone hit him in the head. (Ex. A at 14:45-15:00). Although this was in response to Officer Capranica asking if he got hit with a bat, Brown did not know for sure if that was what he was hit with. (*Id.*). Brown denied needing medical attention and Officer Capranica told him that he would know if he was hit with a bat. (*Id.*). Later, Officer Johnson told the other officers that Larry Anthany never hit anyone with the bat. (Ex. C at 20:12-15). At the end of the night, both Greer Jr. and Brown were arrested for battery. (Doc. 35 at ¶52).

After the incident in question, Officer Johnson was found in violation of SPD Rules of Conduct, based on his failure to record statements from witnesses and information about the bat. (Doc. 37 at ¶¶48-51). Officer Valenti was also found in violation of those same rules based on his failure to include statements made by Cave and his failure to identify Brown's friends in his report. (*Id.* at ¶¶52-55). Officer Buscher was likewise found in violation of the rules because he "did not document his use of force/handcuffing of Mr. Greer" or his observations of the scene. (*Id.* at ¶59).

## III.   DISCUSSION

### A.  Legal Standard

Summary judgment is proper if the movant shows that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a reasonable trier of fact could find in favor of the nonmoving party. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). A factual dispute is only material if its resolution might change the suit's outcome under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling

on a motion for summary judgment, the court must construe facts in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Woodruff v. Mason*, 542 F.3d 545, 550 (7th Cir. 2008). "At summary judgment, a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 664 (7th Cir. 2006) (internal quotations omitted).

The movant bears the initial responsibility of informing the court of the basis for the motion and identifying the evidence the movant believes demonstrates the absence of any genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may respond by showing the existence of an issue of material fact. *Anderson*, 477 U.S. at 255.

### B. Analysis

Section 1983 holds government defendants liable where defendants "subjected or caused to be subjected, any citizen ... or other person ... to the deprivation of any rights" guaranteed by federal law. 42 U.S.C. § 1983. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). Qualified immunity balances two important interests: the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties

reasonably. *Pearson*, 555 U.S. at 231. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.*, citing *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting).

Because qualified immunity is an immunity from suit, rather than a mere defense, the court should resolve immunity questions "at the earliest possible stage in litigation." *Pearson*, 555 U.S. at 231-32. To determine whether qualified immunity applies, courts consider two questions: whether the defendants' actions violate the plaintiff's constitutional rights, and whether the complained-of constitutional violation "clearly established," such that a reasonable officer would have known his conduct was unlawful. *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). If a reasonable officer would not have been aware of the clearly unlawful nature of their actions, qualified immunity applies, and summary judgment is appropriate. *Saucier*, 533 U.S. at 202.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. "Reasonableness is always the touchstone of the Fourth Amendment analysis, and reasonableness is generally assessed by carefully weighing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *County of Los Angeles, Calif. v. Mendez*, 581 U.S. 420, 428 (2017) (internal citations omitted).

1. **Arrest of Greer Jr.**

Defendants argue they had probable cause to arrest Greer Jr. for battery based on the officers' observations and Brown's statement that he was hit. An arrest occurs when a reasonable person in the plaintiff's position would have "understood the situation to constitute a restraint on his freedom of movement to the degree which the law associates with the formal arrest." *Jump v. Village of Shorewood*, 42 F.4th 782, 789 (7th Cir. 2022). The existence of probable cause to arrest is an absolute defense to a § 1983 claim against an officer for unlawful arrest. *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 713-14 (7th Cir. 2013). This is so even where the defendant officers allegedly acted upon a "malicious motive." *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006); *Jump v. Village of Shorewood*, 42 F.4th 782, 789 (7th Cir. 2022) (noting that "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause"). In other words, determining whether an officer had probable cause is "a purely objective inquiry." *Abbott*, 705 F.3d at 714.

"Probable cause to justify an arrest exists if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Abbott*, 705 F.3d at 714. This is a "common-sense inquiry requiring only a probability of criminal activity." *Braun v. Village of Palatine*, 56 F.4th 542, 548 (7th Cir. 2022). This standard is met even where an arrest does not ultimately lead to a prosecution or conviction. *See Sroga v. Weiglen*, 649 F.3d 604, 609-10 (7th Cir. 2011) (noting that probable cause does not require an officer to "act as a judge or jury to

determine whether a person's conduct satisfies all of the essential elements of a particular statute"). The probable cause standard "inherently allows room for reasonable mistakes," because it recognizes that officers must act even when events are rapidly unfolding and chaotic. *Abbott*, 705 F.3d at 714. Qualified immunity also protects officers who "reasonably but mistakenly believe that probable cause exists," under the "arguable probable cause" standard. *Id.* at 715. Thus, "an arrest can be supported by probable cause that the arrestee committed any crime, regardless of the officer's belief as to which crime was at issue." *Id.*; *see also Biddle v. Martin*, 922 F.2d 673, 676 (7th Cir. 1993) (explaining "probable cause need not have existed for the charge for which the plaintiff was arrested, so long as probable cause existed for arrest on a closely related charge").

Plaintiffs allege the officers did not have probable cause to arrest Greer Jr. because the arrest was based on three false and disputed facts. First, Plaintiffs argue Brown never claimed that he was hit by Greer Jr. in Officer Capranica's BWC video. Second, Plaintiffs argue Greer Jr. never swung his fist at Brown, and that none of the BWCs depict him doing so. Finally, Plaintiffs rely on the fact that Officer Johnson "dispute[d] the propriety of arresting" Greer Jr, thus raising doubt as to whether there was sufficient probable cause.

In this case, Greer Jr. was arrested for battery when he was handcuffed and placed in Officer VonBehren's squad car. *See Jump*, 42 F.4th at 789-90 (finding that the moment of arrest was when plaintiff was handcuffed and put into a squad car). In Illinois, a person commits battery when he "knowingly without legal justification by any means: (1) causes bodily harm to an individual, or (2) makes physical contact of an insulting or provoking

nature with an individual." 720 ILCS 5/12-3. When officers arrived, they encountered a chaotic scene: several people were in front of the house fighting and others were yelling. Both Brown and Greer Jr. were in fighting stances, with their hands balled up into fists and facing each other. After Officer Capranica separated the two, Greer Jr. reengaged with Brown and swung his fist in Brown's direction, which is reflected on Officer Capranica's BWC footage. The two men circled each other before ultimately stopping when Officer Capranica threatened to tase them. Cave told officers that the men did not actually hit each other and were just chasing each other around the yard. Later, Brown reported to officers that he was hit in the head, but he did not know who hit him. Based on the totality of circumstances, the officers had probable cause to believe that Greer Jr. committed a battery against Brown.

Even if the officers did not know whether Greer Jr. made physical contact with Brown, the officers did have probable cause to arrest him for the crime of assault. A person commits an assault when he "knowingly engages in conduct which places another in reasonable apprehension of receiving a battery." 720 ILCS 5/12-1. Greer Jr. was in a fighting stance when officers arrived and made statements to Brown indicating his willingness to fight—even in front of officers. After Officer Capranica separated the two, Greer Jr. rushed towards Brown and returned to a fighting stance, which can be seen in Officer Capranica's BWC footage. Plaintiffs also acknowledge that Brown told the officers that Greer Jr. was trying to attack him. Based on the totality of the circumstances, the officers had probable cause to arrest Greer Jr. for either battery or assault. As probable

cause forecloses a Fourth Amendment false arrest claim, Defendants' Motion for Summary Judgment is granted as to this claim.

### 2. Seizure of Cave

Defendants argue it was objectively reasonable to "suspect [Cave] of interference" with their investigation. Plaintiffs allege that the officers were not justified in detaining Cave and used excessive force when detaining her. Defendants did not respond to Plaintiffs' excessive force claims.

The Fourth Amendment "does not forbid all, or even most, seizures—only unreasonable ones." *Torres v. Madrid*, 592 U.S. 306, 325 (2021). An officer may briefly detain an individual under two circumstances. First, a brief detention is authorized if the officer has reasonable suspicion that an individual is engaged in criminal activity. *See Terry v. Ohio*, 392 U.S. 1, 20-21 (1968). Second, restraining an individual may be appropriate in situations that are inherently dangerous, even if the officers do not suspect the individual of a crime. *Estate of Biegert v. Molitor*, 968 F.3d 693, 699 (7th Cir. 2020). In some cases, "it may be reasonable for police to detain people not suspected of criminal activity themselves, so long as the additional intrusion on individual liberty is marginal and is outweighed by the governmental interest in conducting legitimate police activities safely and free from interference" *United States v. Howard*, 729 F.3d 655, 659 (7th Cir. 2013).

"There is no bright-line rule as to how long an investigative detention may last; instead we look to whether the police diligently pursued a means of investigating that was likely to confirm or dispel quickly their suspicions." *Rabin v. Flynn*, 725 F.3d 628, 633 (7th Cir. 2013). The Seventh Circuit has described ten to fifteen minutes as a minimal

amount of time to be seized. *United States v. Glenna*, 878 F.2d 967, 973 (7th Cir. 1989). Even longer detentions can be appropriate under some circumstances. *See, e.g., United States v. Bullock*, 632 F.3d 1004, 1011 (7th Cir. 2011) (thirty to forty minutes); *Rabin*, 725 F.3d at 634 (an hour and a half).

The Fourth Amendment's prohibition against unreasonable seizures bars police from using excessive force. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989). Force is excessive if, in light of the totality of the circumstances, it was greater than reasonably necessary to effectuate the seizure. *Mendez*, 581 U.S. at 427. The reasonableness of the use of force is an objective inquiry. *Graham*, 490 U.S. at 396. If an officer's use of force is reasonable under the circumstances, then there is no valid excessive force claim. *Mendez*, 581 U.S. at 428. The relevant circumstances include: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

Plaintiffs rely on *Gonzalez v. City of Elgin*, 578 F.3d 526 (7th Cir. 2009), to support their argument that officers may not use excessive force during investigatory stops. However, in that case, several plaintiffs were gathered together following a fight they were not involved in, when officers approached the group. *Gonzalez*, 578 F.3d at 530. After that, officers began using force against the plaintiffs, including punching, kicking, pepper spraying, shoving, dragging, and using objects to beat them. *Id.* at 530-36. The officers use

of force in that case was egregious, rendering *Gonzalez* distinguishable from the instant case. Here, the officers did not hit, drag, or pepper stray Cave.

Although *Gonzalez* is inapposite, the Seventh Circuit has addressed the excessive use of force when handcuffing individuals in other cases. In *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009), the Seventh Circuit held, "an officer may not knowingly use handcuffs in a way that will inflict unnecessary pain or injury on an individual who presents little or no risk of flight or threat of injury." In that case, the plaintiff was arrested by officers based on an outstanding traffic warrant. *Stainback*, 569 F.3d at 769. After being asked to put his hands behind his back, the plaintiff told officers that he believed he would be hurt if he were handcuffed but did not inform officers that he had preexisting injuries to his arm and shoulders. *Id.* The officers handcuffed him, and he asked the officers to remove them because the handcuffs were hurting his shoulders. *Id.* The Seventh Circuit found that the arresting officers did not use excessive force, but explained, "[h]ad the Officers known of a preexisting injury or medical condition that would have been aggravated by handcuffing Mr. Stainback, or had Mr. Stainback communicated to the Officers that he suffered from such an infirmity, the Officers certainly would have been obligated to consider that information, together with the other relevant circumstances, in determining whether it was appropriate to handcuff Mr. Stainback." *Id.* at 773.

Likewise, in *Rabin*, the Seventh Circuit held that officers were not entitled to summary judgment on an excessive force claim where the plaintiff proffered evidence that his handcuffs were overly tight and that he had neck and hand problems. *Rabin*, 725

F.3d at 636. During the stop, he told officers that he had a "bad neck" and "bad hand in the past." *Id.* at 631. Instead of removing the handcuffs, the officers switched to a tighter pair, which he complained about. *Id.* Afterwards, Rabin suffered swelling and bruising to his wrists, muscle spasms in his neck, and needed to see a hand surgeon. *Id.* at 632. He also had surgery on his neck to deal with the pains related to these injuries. *Id.* The Seventh Circuit ruled that summary judgment was inappropriate under these circumstances. *Id.* at 636. It also held that qualified immunity did not shield the officer because "no reasonable officer who was aware of Rabin's medical conditions would have believed that exacerbating Rabin's medical problems (*i.e.*, by keeping the handcuffs as tight as they were) was necessary to ensure safety, and that doing so would be permissible under clearly established law." *Id.*

Here, when Cave left the house, she approached Brown and his friend yelling and cursing at them. (*See* Ex. A at 1:40-47). She then focused on Madisyn and told her to get in the house while pushing Madisyn back. (*Id.* at 1:48-53). At that point, it was reasonable for officers to restrain her while they investigated her role in the fight and until she calmed down. However, when she was separated from the other individuals, she asked Officer Valenti to "please get off of [her]" and informed him that she has lupus. As they approached the car, she again pleaded with him to "just let her go" and told him that she would get in the car, but that he was hurting her wrists. By the time the officers adjusted her handcuffs, she had been answering their questions and complying with their orders, although she was in distress. When the handcuffs were adjusted, Cave told the officers, "I said take them off, not tighten them up." As a result of the encounter, Plaintiffs allege

that Cave suffered injuries to her wrist and a lupus flare-up. As a result, she needed to get medications to cope with the pain. (Ex. I at 53). She reported that she was unable to walk and lift things and had considerable swelling and bruising around her wrists. (Cave Dep., Ex. 2 at 34).

Similar to *Stainback* and *Rabin*, Cave had a medical condition that was aggravated by the use of handcuffs. Unlike the plaintiff in *Stainback*, she did not limit her complaints of pain to generalized statements but, rather, clearly communicated to officers that the handcuffs were hurting her based on her lupus. Her statements about having lupus should have placed a reasonable officer on notice that she would be injured when the officers tightened the handcuffs. Further, she told officers that she would get into the squad car and was complying with their orders. While Cave's tone with the officers certainly demonstrated she was frustrated and in distress after seeing her teenage son handcuffed with a taser pointed at his back, there was no indication that she was a threat to safety such that it was necessary for the officers to tighten her handcuffs before placing her in the squad car. Therefore, Officer Valenti is not entitled to qualified immunity at this stage because no reasonable officer who was aware of Cave's medical conditions would have believed that tightening Cave's handcuffs (in light of her medical condition) was necessary to ensure safety, and that doing so would be permissible under clearly established law. *See Rabin*, 725 F.3d at 636.

There was no evidence that the other officers were aware of Cave's medical condition or did anything to exacerbate her medical problems. To the extent that Cave's

claims are directed against officers other than Officer Valenti, qualified immunity does shield them as to that claim. *See Rabin*, 725 F.3d at 636.

### 3. Seizure of Larry Anthany and Entry of the Home

Defendants argue the presence of the officers in the home for four minutes to detain Larry Anthany does not constitute a search of the home and that it was objectively reasonable to detain him as he posed a threat to officer safety. Plaintiffs assert that the officers' warrantless entry into their home to detain Larry Anthany constitutes a presumptively unreasonable search under the Fourth Amendment and the officers were not justified in detaining him.

The Fourth Amendment prohibits the police from making a warrantless and nonconsensual entry into a person's home, except in limited circumstances. *See Lange v. California*, 594 U.S. ––––, ––––, 141 S.Ct. 2011, 2016 (2021). As the Supreme Court noted, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States Dist. Court*, 407 U.S. 297, 313 (1972). This is because at the core of the Amendment "stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion." *Collins v. Virginia*, 584 U.S. 586, 592 (2018). "A person does not abandon this privacy interest in his home by opening his door from within to answer a knock. Answering a knock at the door is not an invitation to come in the house." *United States v. Berkowitz*, 927 F.2d 1376, 1387 (7th Cir. 1991).

When a suspect flees, officers may be able to enter into the suspect's home without a warrant if they are pursuing the suspect. *Lange*, 141 S.Ct. at 2021. However, in the

context of a misdemeanor offense (such as battery), flight alone is not enough to justify a warrantless entry into a home. *Id*. Instead, the court analyzes the totality of the circumstances—including whether there is "imminent harm to others, a threat to the officer himself, destruction of evidence, or escape from the home"—to determine whether an officer was permitted to enter a home without a warrant. *Id*. "[T]he burden is on [Defendants] to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984).

Here, Larry Anthany approached the scene at the same time as the officers. He ran immediately into the house without joining the fray and closed the door behind himself. Although some of the officers claim they saw him with a bat, this fact is disputed. Moreover, even if they did see him with a bat, there was no evidence that the officers saw him use the bat to harm anyone or posed a threat to the officers. This factual dispute is material because if Larry Anthany did not have a bat or pose a threat to the officers, then the officers' warrantless entry into the home and subsequent detention of the minor would not be objectively reasonable. This issue cannot be resolved without resolving the factual dispute, which is improper at this stage of proceedings. Therefore, Defendants are not entitled to summary judgment as to Plaintiff's claims of illegal entry or unreasonable seizure.

## IV.   CONCLUSION

Defendants' Motion for Summary Judgment is GRANTED in part. The Motion for Summary Judgment is GRANTED as to the claims against Officers Buscher, Capranica,

and John Does 1 & 2. Counts I and II are dismissed with prejudice as it relates to Plaintiff Larry Greer Jr. Defendants' Motion for Summary Judgment is DENIED in part as it relates to Plaintiff Larry Anthany's claims against Officers Johnson and Valenti and the City of Springfield and Plaintiff Julia Cave's claims against Officer Valenti and the City of Springfield.

ENTER: September 13, 2024

/s/ Colleen R. Lawless
COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE